*FILED*

OCT 25 2010

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.                                          CRIMINAL ACTION NO. 1:10CR07

MICHAEL J. PAVLOCK,
                    Defendant.

## REPORT AND RECOMMENDATION/OPINION

On the 21st day of October, 2010, came the defendant, Michael J. Pavlock, in person and by

his counsel, Herbert A. Terrell and Craig P. Erhard, and also came the United States by its Assistant

United States Attorney, Andrew Cogar, for a hearing on Defendant's "Motion to Suppress

Evidence," [Docket Entry 129] which motion was filed on September 17, 2010. The United States

filed its Response to the Motion on September 23, 2010 [Docket Entry 147].

## I. Procedural History

A grand jury attending the United States District Court for the Northern District of West

Virginia returned a fifteen-count indictment against Defendant and his co-defendant Richard W.

Powell, Jr., on January 5, 2010. Said indictment charges Pavlock with twelve counts of Wire Fraud

(Counts One through Twelve), and three counts of False Entries in Bankruptcy Document (Counts

Thirteen through Fifteen). There is also a Forfeiture Allegation. Defendant was arraigned on

January 12, 2010, and entered a plea of "Not Guilty" to all counts.

In his  Motion, Defendant moves the Court to suppress all wired and audio-taped

conversations; information discovered during a search of "a bankruptcy estate property being

purchased by Michaels Automotive Services, Inc.;" records, files and IRS testimony; Defendant's

statements; Co-defendant Powell's statements; witness documents provided to investigators and

"other crimes evidence, prior bad acts evidence, witness criminal records or any document/exhibit

informally requested in discovery and not provided to the defense;" <u>Giglio/Brady</u> evidence not produced to Defendant; and FBI/IRS Interview Notes.

During the suppression hearing, the undersigned  received the testimony of Defendant Michael Pavlock, and heard the arguments of counsel.

## II.  Discussion

### A.    Wire and Audiotaped Conversations

Pavlock first argues that conversations obtained by the United States via body-wire taped conversations include "other crimes" utterances by the wearer of the "wire" and other participants, and that it is unclear under what circumstances the wires were made.  "Thus it cannot be fully discerned if the wearer of the wire was instructed to 'entrap' the other participants in the recorded or transcribed conversations."

Pavlock further argues that several of the tapes have sound distortion issues, making it unclear who is speaking and ambient noises which obscure what is being stated.  Further, the tapes or transcripts do not reveal where, when and how they were recorded, and the defendant is therefore not provided with any particulars as to whether the conversations may be privileged based on an expectation of privacy.

Pavlock further argues the United States has not shown whether the wires were sought by warrant or other authority; that to the extent any of the conversations were obtained post-indictment the conversations violate his Sixth Amendment rights; and that any communications in which Pavlock's attorney was present should be deemed privileged.  Finally, to the extent the tapes are inaudible, they should be excluded at trial.

The Government simply argues that no privileged communications were obtained and none of Pavlock's rights were violated. The Government contends that the FBI captured consensual recordings between Pavlock and others "[w]ell before the indictment in this case." Further, the transcripts of the recordings were included in the government's disclosures, identifying the dates of the recordings and all participants in the conversation. To the government's knowledge no attorneys participated in any of the conversations, and even if they had, no part of the conversations were privileged because they were not confidential. Finally, such consensual recordings did not violate Pavlock's rights.

18 U.S.C. section 2511, the Federal Wiretap Statute, provides, in pertinent part:

> (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

> (d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

The Fourth Circuit in U.S. v. Glasco, 917 F.2d 797 (4th Cir. 1990) noted in a footnote that 18 U.S.C. section 2511 explicitly does not exclude from evidence intercepted wire or oral conversations when one of the parties has consented to the intercept. Defendant argues that "[n]o showing has been made, if required, whether the procedures for compliance of any warrant or statutory authority was complied with." In U.S. v. Stinson, 594 F.2d 982 (4th Cir. 1979), another Fourth Circuit case, the defendant objected to the admission of evidence of the government's

surreptitious recordings of his conversations with an informant and his conversation with a special agent. The informant and the agent were wired for sound and consented to the recordings. Stinson, as does Defendant here, stressed the absence of any prior judicial authorization. The Fourth Circuit held that "[t]he consent of a participant in each recorded conversation, however, makes this argument immaterial." Insofar, therefore, as the recordings were consented to by at least one of the parties to the conversations, the recordings are admissible.

Defendant also argues: "[T]o the extent any of the taped conversations were obtained post indictment, the conversations violated [his] 6th Amendment rights." As already noted, the Government counters that the tapes were made pre-indictment. Further, the Government represents that it has produced the dates of all the recordings, which should resolve this issue.

Defendant also argues that, if recordings were made of conversations during which his counsel or staff attorney was present, these should be deemed privileged. The Government counters that it is not aware of counsel being present during any of the taped conversations, and that, moreover, none of the conversations was privileged. Again, the Government represents that it has produced the dates of each recording and the names of the participants in each recorded conversation.

Finally, Defendant argues that, to the extent the tapes are inaudible, they should be excluded from the trial of this case. The undersigned first finds this is a matter more suited to a Motion in Limine than a Motion to Suppress. The undersigned does note, however, that in United States v. Hall, 342 F.2d 849 (4th Cir. 1965), the Fourth Circuit upheld the admissibility of a tape-recorded conversation between the defendant and an undercover agent where as much as 25 percent of the taped conversation was inaudible, but the portion of the tape relating to the offer and acceptance of

a bribe was clear and audible. The Fourth Circuit in <u>Hall</u> cited with approval <u>Addison v. U.S.</u>, 317 F.2d 808 (5th Cir. 1963), in which the Fifth Circuit upheld the admission of a tape recording of a conversation even though one half of the tape was defective and the speech or conversation on the defective portion of the tape was not available for trial. The Fifth Circuit held: "Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge."

"A trial judge has wide latitude in determining the admissibility of tape recorded evidence." <u>U.S. v. Mickens</u>, 837 F.Supp. 745 (S.D.W.Va. 1993), citing <u>U.S. v. Huff</u>, 959 F.2d 731 (8th Cir.), <u>cert. denied</u>, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992); <u>U.S. v. Disbrow</u>, 768 F.2d 976 (8th Cir.) <u>cert. denied</u>, 474 U.S. 1023, 106 S.Ct. 577, 88 L.Ed.2d 560 (1985); <u>U.S. v. Scaife</u>, 749 F.2d 338 (6th Cir. 1984); <u>U.S. v. Watson</u>, 594 F.2d 1330 (10th Cir.), <u>cert. denied</u>, 444 U.S. 840, 100 S.Ct. 78, L.Ed.2d 51 (1979).

During the hearing Defendant focused on one CD recording dated April 11, 2007, which may have been made during a staff meeting. On that CD there are more than two voices, but only Pavlock is identified. Pavlock himself testified that attorney Kevin Clancy was counsel for several of the entities involved in the investigation, and also acted at some times as Pavlock's own personal attorney. The recording was made at offices maintained at 625 Fairchance Road, where Golden Investments had offices. Pavlock himself testified he was not employed there, but was at the meeting in question. He would meet with individuals and discuss matters in which he was interested, such as why things were not more organized. Attorney Clancy was sometimes present at these meetings. Further, there was a confidentiality agreement between the company and employees, and no one would have been authorized to record the proceedings.

Pavlock testified he had not listened to the recording, but was aware it was available. He had no recollection whether attorney Clancy was present at the meeting. If the meeting was for the Masontown Telegraph, he would not necessarily have called for or run the meeting, but he could have. Normally co-defendant Richard Powell called those meetings, although Pavlock would often attend. If the meeting was for Golden Investments, generally Spencer Graham would call and run the meeting, although, again, he might attend. For the Limousine company, Spencer Graham would call the meeting, for Michael's Automotive Services, Spencer Graham would call the meeting, and for Fayette Investment Acquisitions, Richard Powell would call the meetings. Spencer Graham employed Kevin Clancy for all the entities, including Golden, Michael's Automotive, Masontown Telegraph, and the Limousine company. The office at Fairchance Road was used by Golden, Michaels' and sometimes Masontown Telegraph.

Pavlock did not believe attorney Clancy represented him in any personal matters at the relevant time.

Defendant argued that he did not know who the participants were in the recorded meeting; no one was authorised to record the meeting; there was a confidentiality clause between employees and all the entities; and he could not prove Kevin Clancy was present.

The United States argued that Defendant had not met his burden of showing that any attorney-client privilege attached to the recording.

Upon consideration of all which the undersigned finds:

1.      The Motion to Suppress involved a recording from an April 11, 2007, staff meeting of some entity at the Fairchance Road location.

2.      The evidence does not disclose the identity of the participants, but there are more than two.

6

3.    Pavlock was identified as being at the meeting.

4.    The meeting was recorded without Pavlock's knowledge or consent, but was recorded by another participant.

5.    There is no evidence Clancy or any other attorney was present.

6.    Even if Clancy was present, Pavlock recalls that Clancy was not representing him personally at the time.  He was, however, counsel for at least two of the entities involved in the investigation.

7.    Even if Clancy was present, the presence of other individuals at the meeting  defeats the attorney-client privilege.

8.    There is no evidence that any of the individuals involved in the meeting were parties to a confidentiality agreement.

9.    Even if the individuals were parties to such a confidentiality agreement, this would be contractual and not a privilege recognized under West Virginia law.

10.   There is no evidence anyone acted under color of law in making the recording.

11.   If Kevin Clancy was present at the meeting he was hired to represent an entity by Spencer Graham, not Pavlock.

12.   There are no other recordings or wires at issue at this time.

The undersigned United States Magistrate Judge concludes: that 18 U.S.C. §2511 authorizes the use of the recorded conversations at issue; there were no violations of 18 U.S.C. §2511; no attorney client privilege was violated by the taping of conversations during meetings by a participant to the same even though it was without the knowledge or consent of the others; even if Kevin Clancy was present, any attorney-client privilege was destroyed by the presence of other individuals; and

7

no other privilege cognizable under law was violated by the taping of the conversations at the meetings by a participant in the meetings and conversations. Insofar as any of the recordings may be unintelligible (which issue was not argued during the hearing), this issue is better presented as a Motion in Limine after all the recordings are reviewed by the parties. The undersigned therefore recommends Defendant's Motion to Suppress regarding body wires/tapes be **DENIED** with prejudice regarding the substance of the recordings but without prejudice regarding the audibility of the recordings.

**B.     Search of Business Premises**

Pavlock also moves the Court to suppress any and all evidence obtained during a search of business premises that were under the control of U.S. Bankruptcy Trustee, Lisa Swope, Trustee in the Earl and Karen Swaney Bankruptcy case in the Western District of Pennsylvania.

The Government argues that its "plain view" search of the "Collier Road Property" was properly limited and lawful. The Government contends, and attaches exhibits indicating that at the time of the search, the property was part of the bankruptcy estate for Earl and Karen Swaney and Lisa Swope was the Chapter 11 bankruptcy trustee of that estate. The exhibit indicates that on April 28, 2009, the United States Bankruptcy Court of the Western District of Pennsylvania ordered Michael's Automotive Sales ("MAS") and its agents to "immediately vacate" the Collier Road property, and turned over the property to Ms. Swope. Only after that order, FBI Agent Fox received express permission from Ms. Swope to enter and view the property. She mailed SA Fox the key and security alarm code to the property. The search was conducted on May 19, 2009, well after MAS was ordered to vacate the property. Further, the Government argues that agents did not seize

anything, nor did they search the interior of any vehicle or container at the site, but merely observed and recorded what was in plain view.

The Government argues the search of the property did not violated Pavlock's rights because the agents had the lawful permission of Ms. Swope, who had actual or at the minimum apparent authority to permit the entry and search of the property.

During the hearing, Pavlock, through counsel, withdrew the motion to suppress insofar as it concerned the search of the Collier Road property.

Neither party cites, and the undersigned was unable to find any case law directly on point. In Kroll v. U.S., 433 F.2d 1282 (Fifth Cir. 1970), the appellant complained that his motion to suppress the search of the books of a company was erroneously denied because the evidence was obtained through an unlawful search. The company at issue was petitioned into bankruptcy, and the referee in bankruptcy ordered the trustee to take possession of and remove the records from the premises of the company. One and one half years later, an accountant for the SEC requested the trustee's permission to examine the books. The trustee granted permission. The SEC accountant remained on the scene for two years and evidence he gathered was presented to the grand jury and at appellant's trial. The Fifth Circuit found two principal issues: 1) the appellant's standing to object to the search, and 2) the authority of the trustee to consent to the search. The court began its discussion with Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1967), in which the United States Supreme Court considered the issue of standing, pointing out that "standing to object to a search or seizure belongs to one who has title to the premises searched, or to one who has a possessory interest in the premises, or to one legitimately on the premises where the search occurs." Further, "the right to claim the protection of the Fourth Amendment depends not only on a property

right in the invaded place, but also upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

In Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court found: "Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppression of relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy."

Based upon the above Supreme Court cases, the Fifth Circuit in Kroll concluded that the appellant did not have standing to complain about the search, finding: "Once the corporation was in bankruptcy, Cahn no longer had any title in the corporate records, as title passed by operation of law to the trustee in bankruptcy . . . . Neither did Cahn have any possessory interest in the corporate records. Kroll, 433 F.2d at 1288-89. The court further found that Cahn had no "reasonable expectation" of privacy, as the Trustee is an agent of the bankrupt, is an officer of the court, and a representative of creditors as well. Id. "In light of the strong governmental interest in protecting creditors in a bankruptcy situation a bankrupt would indeed be shortsighted if he did not perceive that many interested parties, governmental or otherwise, might be interested in examining the books of the bankrupt business.

In light of the court's finding that the appellant did not have standing to object to the search, the court did not discuss the second question– the bankruptcy trustee's authority to consent to the search. This Court, however, has discussed the issue. In U.S. v. Patrick, 916 F.Supp 567 (N.D.W.Va. 1996), a bankruptcy trustee gave permission to government agents to take custody of all books and records of Metro Printing and Mailing Services, Inc. The defendant moved to suppress

10

the search. Magistrate Judge John Fisher found that a valid consent was obtained for the search, and it was therefore unnecessary for the Court to resolve the standing question.

The defendant appealed, arguing that the bankruptcy trustee did not have authority to consent to a search "– a trustee cannot waive a bankrupt party's Fourth Amendment rights." United States District Judge Robert Maxwell first noted the Supreme Court's finding that "[t]he powers and duties of a bankruptcy trustee are extensive." (citing Commodity Futures Trading Comm'n. v. Weintraub, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). He then cited 11 U.S.C. sections 323, 541, and 704, which provide that upon commencement of a case in bankruptcy all corporate property passes to an estate represented by the trustee. The trustee is accountable for that property and has the duty to maximize the estate. The Court then held:

> Given the responsibilities borne by a bankruptcy trustee, it is believed that the trustee may cooperate with a criminal investigation of the debtor corporation and may consent to a search of corporate books and records.

Id. at 571. The Court did note that, if the government had seized property during the search that was not owned by the debtor and/or was not property which passed to the estate represented by the trustee, it believed such items were subject to suppression.

There is a clear difference between Patrick and the case a bar. Here the individual objecting to the search is not the debtor, but a purported purchaser of the estate in bankruptcy. The trustee's position, however, does not change. Upon the commencement of the Swaney bankruptcy the property at issue passed to Ms. Swope, the trustee. She was accountable for that property and had a duty to maximize the estate. On April 28, 2009, after notice and a hearing, U.S. Bankruptcy Judge Bernard Markovitz ordered "Michael's Automotive Service, Ins., its agents, and/or its employees

. . . to **IMMEDIATELY VACATE** the property . . . ." Judge Markovitz further ordered the property "be turned over to Lisa M. Swope, Trustee . . . ."

The undersigned finds Ms. Swope had actual authority to consent to the search of the property. The Court further finds Defendant had no standing to contest the search on the date it occurred. The undersigned in particular notes Defendant's contention that agent Fox searched for over five hours– much longer than necessary. Ms. Swope, however, notes in her motion to request contempt of court, that it took she and the "Buyer" and "Debtor" 6.5 hours to inventory all "tools of the trade" on the property when Defendant originally offered to purchase the property from the bankruptcy estate.

For all the above reasons, the undersigned recommends Pavlock's Motion to Suppress regarding the search of the Collier Road property be **DENIED with prejudice**.

## C.     IRS Records, Files, and Testimony

Pavlock next argues the Court should suppress any information obtained by the FBI or the U.S. Attorney from the IRS. Pavlock argues the dissemination of the IRS file violates his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel.

The Government counters that the IRS investigation of Pavlock was a civil investigation of MAS's tax delinquency, which did not violate Pavlock's Fifth or Sixth Amendment rights. The Government contends that in September 2007, the IRS initiated a civil revenue investigation of MAS, "unbeknownst to the FBI or the United States Attorney's Office." After the indictment in the case at bar, the IRS provided certain records and documents relating to its investigation, pursuant to an *ex parte* order for tax information. The Government further argues that the IRS did not take orders from the FBI during its civil revenue investigation of MAS.

12

Because the IRS investigation was civil in nature, the Government further argues that no right to counsel existed during that investigation. No judicial proceedings had been initiated at the time. Moreover, "information sharing between federal agencies does not violate the defendant's rights."

Defendant's argument that his Fifth and Sixth Amendment rights were violated implicates Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are required when a subject is interrogated while in custody. The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420 (1984)(internal quotations omitted.)

In U.S. v. Browney, 421 F.2d 48 (4th Cir. 1970), the defendant had also asserted that his Fifth and Sixth Amendment rights were violated during the course of an IRS agent's investigation. The Fourth Circuit first found:

> In a situation in which a taxpayer is interrogated while he is in actual custody, Miranda is applicable and the Miranda warnings must be given prior to the interview. Mathis v. United States, 391 U.S.1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). However, Mathis has no application here since Browney was not in custody at the times of the interviews. . . .

There is no evidence that Defendant was in custody at the time(s) he was interviewed by the IRS. Miranda therefore does not apply.

Pavlock argues, however, that the IRS investigation started out as civil but became a criminal investigation. According to the record before the Court, on September 8, 2007, the IRS was gathering information to "put together case file for initial analysis" regarding Michaels Automotive Services, Inc. (Government Ex. 1, p. 1). On October 2, 2007, the IRS' record search showed Mike Pavlock as a Member and Organizer of that entity (Id. at pp. 2 and 3). On October 3, 2007, the

investigator noted it appeared Michael Pavlot [sic] had not filed a personal income tax return and possible criminal tax fraud investigation was being considered (Id. at 5).

On January 29, 2008, the IRS received a voice mail from FBI Agent Brian Fox in regards to Michaels Automotive Services, Michael Pavlock and Spencer Graham. The IRS investigator verified with counsel that he was unable "to even acknowledge that I have case and need for FBI to get an 'I ORDER' so that they could get information from IRS." When the investigator returned Agent Fox's call, Agent Fox immediately told him that he was aware the IRS could not disclose information even as to whether there was a case or not. Agent Fox said he did want to let the IRS know that Pavlock was being investigated regarding possible drug dealing and he was in the process of getting an ex-parte order that would allow him to confer with the IRS (Plaintiff's Exhibit at p. 8). Defendant argues that that information, which was false, changed the focus of the IRS investigation from civil to criminal. The Government argues that that information was provided, pursuant to policy, solely due to concerns for the safety of the civil IRS investigators. The record does show that IRS agent Madden indicated he would speak with the IRS criminal investigator about the tax fraud case.

On February 22, 2008, IRS Agent Madden indicated that the criminal investigator did not want the case at this time (Id. at 10). On May 30, 2008, the IRS Agent "considered" contacting FBI Agent Madden regarding pursuing possible criminal fraud, or consider the possibility of the case being transferred to Grade 13. The IRS Agent apparently finally made contact with the FBI (Agent Steve Anderson substituting for Brian Fox, who was in Iraq). Agent Anderson informed the IRS Agent that he believed Pavlock purchased businesses and then later defaulted, and that Earl Swaney claimed he was put into bankruptcy by Pavlock. He had no knowledge any of the individuals was

involved with drugs. He indicated the FBI was investigating Pavlock for various defrauding activities, but would not elaborate any further (Id. at p. 22).

On August 26, 2008, Brian Fox contacted the IRS, wanting to know if they had opened a criminal investigation. He got an ex-parte order and wanted to share some information. He had contacted the Clarksburg IRS, who indicated they weren't interested. He said he had evidence that there was fraud and money laundering going on. Fox was told to contact the Pittsburgh Criminal Investigations Division. As of September 4, 2008, there was still no IRS criminal investigation (Id. at p. 29).

More than a year later, on August 21, 2009, Brian Fox called the IRS to ask what he needed to do to get the IRS records. The IRS Agent informed him he would have to contact his disclosure attorney to see if there was any procedure that would allow the FBI or DOJ access to the records. He then restated that he could not even confirm or deny that he had an investigation (Id. at 37). He was then informed by the disclosure attorney that the taxpayer return information could only be disclosed via court order, but other information regarding the investigation would not need a court order, although it would still need to go through the Disclosure Office.

The last IRS report on record before the Court is dated October 2009. There is no indication as of that date that the IRS had opened a criminal investigation.

Defendant argues that Federal law protects tax information from being disseminated to anyone, including the FBI. The Government contends and the exhibits show, however, that at the time of its own investigation, the IRS was unable to even confirm that they were investigating Pavlock. The IRS was solely conducting an investigation regarding IRS revenue transactions– nothing to do with a criminal matter. That investigation began in 2007. The IRS could not provide

the information absent an ex parte order. Further, although the exhibits indicate the IRS was "considering" possible criminal fraud charges due to its discovery that Pavlock had not filed any income tax returns, they did not actually open a criminal investigation, therefore there was no Sixth Amendment violation. There is no evidence in the record before the Court that the FBI received any of the IRS information prior to the indictment.

The undersigned therefore recommends Defendant's motion to suppress in this regard be DENIED.

## D.    Pavlock's Statements

Pavlock next argues the Court should suppress statements, admissions or conversations government agents obtained from Pavlock out of the presence of an attorney, and also statements obtained when he was acting *pro se*, before which he was not advised of his Miranda rights "at each step where some informal conversation between he and government agents might have occurred." Additionally, Pavlock argues the United States ought not be permitted to use his statements to the IRS, pre-indictment, "where the claim for assistance of counsel was known to the IRS, obeyed by that agency, and yet, secretly obtained by the FBI who now seeks to use same in the instant case."

The Government argues simply in this regard that Pavlock's motion should be denied as being without foundation or specificity.

During the hearing, Pavlock, through counsel, conceded that although he had had informal conversations, he did not believe any had any bearing on his Fifth or Sixth Amendment rights, and therefore withdrew the motion regarding this issue.

Upon consideration of all which, the undersigned recommends Pavlock's motion to suppress in regard to his own statements is **DENIED**.

## E.       Co-Defendant Statements

Pavlock next argues the Court should suppress any statements made by co-defendant Powell to the AUSA and FBI.  Again, the Government argues simply that Pavlock's motion in this regard is frivolous inasmuch as he has failed to identify any statements by Powell which should be redacted.

The Confrontation Clause of the Sixth Amendment is violated – and severance is required – when a nontestifying co-defendant's confession naming the defendant as a participant in the crime is admitted, even if the jury is instructed to consider the confession only against the confessing co-defendant.  Bruton v. United States, 391 U.S. 123 (1968).  Even if the moving defendant's name is redacted, severance is required "if . . . it is clear that a particular defendant is implicated . . . ." United States v. Akinoye, 185 F.3d 192 (4th Cir. 1999), cert. denied, 528 U.S. 1177 (2000).  On the other hand, there is no Sixth Amendment violation, and severance is not required, unless there are "facially incriminating statements," not merely statements which only become incriminating when linked to other evidence.  Richardson v. Marsh, 481 U.S. 200 (1987).  In Akinoye, the Fourth Circuit considered the question "whether redacted statements that refer to the existence of another party who *may* be defendant through symbols or neutral pronouns may be admissible."  The Court ultimately answered this question in the affirmative.

Despite the fact that Defendant has "several 302's purporting to be interview statements of Richard Powell," Defendant has not provided the answers to any of the questions necessary to make a determination regarding this issue.  Are these statements confessions?  Do they contain facially

incriminating statements? Do they name Defendant as a participant in the crimes alleged? If Defendant's name is redacted, is it still clear that he is implicated? Will Powell be testifying?

The Government argues that it has disclosed the 302's. The Government represents that it did have meetings with Powell after he declared himself to be acting *pro se.* The discussions concerned discovery and tentative plea agreements. There were substantive discussions but no resolutions. If the Government discovers it has failed to provide any of the 302's it represented to the Court that it would produce them to Defendant by the end of the day.

Notably, neither party provided the 302's for the Court's consideration, nor did either party have copies of the documents for the Court to review.

Upon consideration of all which, the undersigned finds that the discussions with Powell took place after he declared himself *pro se.* The undersigned cannot, however, be certain that there are no statements contained in the 302's that are facially incriminating and also incriminate Pavlock.

Upon consideration of all which, the undersigned recommends Pavlock's motion to suppress on <u>Bruton</u> grounds be DENIED without prejudice to raise in a Motion in Limine or at the Final Pretrial conference if Defendant discovers a <u>Bruton</u> issue in the 302's.

## F.    Witness Documents Provided to Investigators.

Pavlock next argues the Court should suppress "any document not provided to the defense," including the FBI's 302's, any relevant documents which may be exculpatory or inculpatory which were not provided to the defense, and any documents not specifically identified as having been utilized in grand jury proceedings. The Government asserts that any documents presented to the grand jury in this case were included in the Government's disclosures.

Fed.R.Cr.P. 16(a)(1) requires the Government to disclose this information and the dates by which they were to be disclosed are contained in the Court's Scheduling Order. Rule 16(a)(2) provides exceptions to this rule, including "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigation or prosecuting the case [as well as] statements made by prospective government witnesses except as provided in 18 U.S.C. 3500."[1]

The Government represented during the hearing that Defendant had everything from the grand jury. Pavlock advised that he believed he had all the FBI 302's from witnesses, but was unsure if he had information he attributed to "Beasley."

The undersigned recommends Defendant's motion to suppress in this regard be Denied without prejudice.

## G.     Other Crimes or Bad Acts Evidence, Witness Criminal Records, <u>Giglio/ Brady</u> Material or Any Document Informally Requested in Discovery and not Provided to the Defense.

Pavlock moves the Court to suppress any other crimes evidence, prior bad acts evidence, witness criminal records, or any document/exhibit informally requested in discovery and not provided to the defendant. The Government counters that this motion is more appropriately presented as a motion in limine. Further, the Government represents that has included in its disclosures to Pavlock any documents presented to the grand jury.

---

[1]Under 18 U.S.C. 3500, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case."

Rule 404(b), Giglio, and Roviaro evidence is not due in this case until November 15, 2010.

As to exculpatory evidence, the Court's original scheduling order indicates this was due long ago.

Under F.R.Cr.P. 16(d)(2) failure to comply with required disclosure may result in the Court:

A) ordering the non-complying party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;

B) granting a continuance;

C) prohibiting that party from introducing the undisclosed evidence; or

D) entering any other order that is just under the circumstances.

The Fourth Circuit in U.S. v. Hastings, 126 F.3d 310 91997) held:

that it was not an abuse of discretion for the district court to sanction the government in some way for its recalcitrance. However, we further hold that dismissal of the indictment against Hastings was an extreme and inappropriate sanction. When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction which will adequately punish the government and secure future compliance. See United States v. Maples, 60 F.3d 244, 247 (6th Cir. 1996); United States v. Perez, 960 F.2d 1569, 1572 (11th Cir. 1992). In determining a suitable and effective sanction, a court must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government. See Maples, 60 F.3d at 247; see also United States v. Shaffer Equip Co., 11 F.3d 450, 463-64 (4th Cir. 1993) (employing similar factors in a civil context).[2] (Emphasis added).

Therefore, even if *arguendo*, the Government had failed to disclose evidence in violation of the Court's order, Hastings instructs that if some sanction is appropriate, the court must impose the least severe sanction that will accomplish the desired result which is the prompt and full compliance with the Court's discovery orders.

---

For all the above reasons, the undersigned finds a motion to suppress based upon failure to disclose evidence is premature. Further, even if there were non-disclosed evidence, the court must impose the least severe sanction which, at this point in the proceedings could be accomplished by ordering the government to immediately produce the discovery.

The undersigned therefore recommends Pavlock's motion to suppress 404(b), Giglio, and Brady material be **DENIED** as premature.

## I.     FBI/IRS Interview Notes.

Pavlock finally argues that none of the FBI or IRS interview notes are admissible because no witness or interviewee acknowledged, notarized or provided an oath attesting to the agent's notes of the interview. The Government simply counters that this portion of the motion is, in essence, moot, because the Government has no intention of using any such notes as evidence.

First, the Court does agree with the Government that this issue is one of admissibility and not suppression. Second, as the Supreme Court explained in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), only witness statements "which could properly be called the witness' own words" and "reflect fully and without distortion what had been said to the government agent" are producible under the Jencks Act." Further, a government agent's interview notes that "merely select [] portions, albeit accurately, from a lengthy oral recital" do not satisfy the Jencks Act's requirement of a "substantially verbatim recital." Id. at 352, 79 S.Ct. at 1224-25. Finally, insofar as the Government's representation that it does not intend to use any such notes, the undersigned notes that any Jencks Act material was to be disclosed on or before July 23, 2010.

For all the above reasons, the undersigned recommends Pavlock's motion to suppress FBI/IRS agent notes be **DENIED**.

## IV. RECOMMENDATION

For the reasons herein stated, the undersigned accordingly respectfully **RECOMMENDS** Defendant's Motion to Suppress [Docket Entry 129] be **DENIED.**

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *25* day of October, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

22